BOTTINI & BOTTINI, INC.
Anne B. Beste (SBN 326881)
 abeste@bottinilaw.com
Francis A. Bottini, Jr. (SBN 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
 achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
 ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **SALVATORE TORONTO, on behalf of himself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**GOOGLE, LLC,**<br><br>**Defendants.** | CASE NO: 5:21-cv-3725<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   JURISDICTION ................................................................................................ 9

III. PARTIES ......................................................................................................... 10

IV. FACTS ............................................................................................................ 10

    A.   The Critical Importance of Advertising Revenue to Google ........................... 10

    B.   A Sampling of Google's Past Violations of Privacy Laws .............................. 12

    C.   Google Falsely Promises to Protect Its Customers' Privacy ........................... 15

    D.   Google Represents That It Will Not Sell Customers' Personal Information ................. 18

      1. Google's Privacy Policy Promised to Protect Google Account Holders ......................... 19

      2. Google's Terms of Service Falsely States that Google Will Not Sell Personal
         Information ............................................................................................. 21

    E.   Google Account Holders Are Not Told About the Use of Their Personal Information in
        RTB Auctions ........................................................................................... 22

      1. How Google Shares Its Customers' Personal Information on the RTB Auction ............. 24

      2. Google Sells RTB Participants Personally Identifiable Information About Its
         Customers ............................................................................................. 25

      3. Google's Cookie Matching Service Enables RTB Participants to Gain Account Holders'
         Personal Information ................................................................................. 25

      4. Millions of Companies Buy Google Account Holders' Personal Information ................. 26

    F.   Google's Conduct is Quantifiable for Purposes of Assessing Damages ......................... 28

V.    CLASS ACTION ALLEGATIONS ................................................................ 29

VI.   CAUSES OF ACTION ................................................................................... 31

VII. PRAYER FOR RELIEF ................................................................................. 47

VIII. JURY TRIAL DEMAND ............................................................................... 48

1    Plaintiff, individually and on behalf of all others similarly situated (the "Class," as

2    defined below), files this class-action complaint against Google LLC ("Defendant").   Plaintiff

3    alleges the following (a) upon personal knowledge with respect to the matters pertaining to

4    Plaintiff; and (b) upon information and belief with respect to all other matters, based upon,

5    among other things, the investigations undertaken by Plaintiff's counsel. Plaintiff believes that

6    substantial additional evidentiary support will exist for the allegations set forth below after a

7    reasonable opportunity for discovery.

8    **I.   INTRODUCTION**

9    1.    Since at least 2009, Google has misled consumers into believing that it does not

10   sell their personal information, but then done exactly that, earing billions of dollars in advertising

11   revenue in the process.  Google has continued to do so even after paying hundreds of millions of

12   dollars in settlements to federal, state, and E.U. regulators, as part of which it promised to stop its

13   unlawful practices.

14   2.    For example, on September 4, 2019 it was announced that Defendant Google LLC

15   and its subsidiary YouTube, LLC would pay a record ***$170 million*** to settle allegations by the

16   Federal Trade Commission and the New York Attorney General that the YouTube video sharing

17   service ***illegally collected personal information from children without their parents' consent***.

18   A true and correct copy of such settlement agreement is attached hereto as **Exhibit 1**.

19   3.    The settlement required Google and YouTube to pay $136 million to the FTC and

20   $34 million to New York for allegedly violating the Children's Online Privacy Protection Act

21   (COPPA) Rule. The $136 million penalty was at the time by far the largest amount the FTC had

22   ever obtained in a COPPA case since Congress enacted the law in 1998, and upon information

23   and belief remains to this day the largest COPPA settlement.

24   4.    In their complaint filed against the companies, the FTC and New York Attorney

25   General alleged that YouTube violated the COPPA Rule by collecting personal information—in

26   the form of persistent identifiers that are used to track users across the Internet—from viewers of

27   child-directed channels, without first notifying parents and getting their consent. YouTube

28

earned millions of dollars by using the identifiers, commonly known as cookies, to deliver targeted ads to viewers of these channels, according to the complaint.

5.     The COPPA Rule requires that child-directed websites and online services provide notice of their information practices and obtain parental consent prior to collecting personal information from children under 13, including the use of persistent identifiers to track a user's Internet browsing habits for targeted advertising. In addition, third parties, such as advertising networks, are also subject to COPPA where they have actual knowledge they are collecting personal information directly from users of child-directed websites and online services.

6.     "YouTube touted its popularity with children to prospective corporate clients," said FTC Chairman Joe Simons at the time. "Yet when it came to complying with COPPA, the company refused to acknowledge that portions of its platform were clearly directed to kids. There's no excuse for YouTube's violations of the law."

7.     The YouTube platform allows Google account holders, including large commercial entities, to create "channels" to display their content. According to the complaint, eligible channel owners can choose to monetize their channel by allowing YouTube to serve behaviorally targeted advertisements, which generates revenue for both the channel owners and YouTube.

8.     YouTube is today's leader in reaching children age 6-11 against top TV channels. YouTube: The new "Saturday Morning Cartoons". 93% of tweens visit YouTube to watch videos. YouTube is unanimously voted as the favorite website of kids 2-12. In fact, it's the #1 website regularly visited by kids. Google and YouTube told Mattel, maker of Barbie and Monster High toys, that "YouTube is today's leader in reaching children age 6-11 against top TV channels" and told Hasbro, which makes My Little Pony and Play-Doh, that YouTube is the "#1 website regularly visited by kids."

9.     Google's 2019 Settlement with the FTC and N.Y. (see Ex. 1) also prohibited Google and YouTube from violating the COPPA Rule, and required them to provide notice

about their data collection practices and obtain verifiable parental consent before collecting personal information from children.

10.     While the 2019 settlement and judgment against Google represented the largest fine or penalty related to COPPA, it was by no means the only privacy judgment that has been entered against Google.  Other judgments related to privacy violations include, as reflected in the attached chart, a $57 million fine from French authorities, a $22.5 million fine imposed by the FTC in 2012, a $7 million fine imposed by states in 2013, and a $1.4 million fine by Italian authorities in 2014:



11.     With respect to the French judgment, On 21 January 2019, the French National Data Protection Commission (CNIL) imposed a €50m (£44m) fine against Google LLC, following complaints made by the privacy rights groups None Of Your Business and La Quadrature du Net three days after the enactment of the General Data Protection Regulation (GDPR).

12.     The CNIL found that, despite seeking to implement corrective measures, Google had:

a.  breached its obligations to act transparently and provide information in a way
    that was easily accessible to its users. Relevant information about data
    collection and processing was only accessible after several (and up to 5 or 6)
    actions, and was neither clear nor comprehensive, and

b.  did not have any legal basis for processing its users' data in order to provide
    personalized advertisements. Users had given consent to Google for all the
    processing purposes carried out by Google (including ads personalization but
    also speech recognition and other purposes). Consent, under the GPDR, must
    be specific and given distinctly for each processing purpose.

13.     Google filed a frivolous appeal of the $57 million French fine.  The appeal was
"slapped down" by a French court, as reported on June 19, 2020.  See Natasha Lomas, "French
Court Slaps Down Google's Appeal Against $57M GDPR Fine," Tech Crunch, June 19, 2020.

14.     Since the 2019 settlement with the FTC, Google's violations of privacy laws have
continued unabated.  Google has repeatedly represented to consumers that it values privacy and
gives users control of their personal information. Just months before it was forced to pay the
$170 million judgment to the FTC, Google's CEO Sundar Pichai stated that "Google will never
sell any personal information to third parties" and "you get to decide how your information is
used."[1] These promises were, and continue to be, false. Google monitors customers who have
Google accounts ("Account Holders") on their Internet presence, then makes billions of dollars
by selling consumers' sensitive personal information.

15.     Information, as they say, is the new oil or gold.  Alphabet, through its wholly-
owned subsidiary Google LLC, has amassed a huge treasure trove of its clients' personally-
identifiable information in order to profit from such data.

16.     Contrary to Google's promise that it will protect its users' privacy, Google in fact
sells and shares Google Account Holders' sensitive personal information to millions of

---

[1] Pichai, Sundar (May 7, 2019), *Google's Sundar Pi*chai: Privacy Should Not Be a Luxury Good,
The New York Times, available at https://www.nytimes.com/2019/05/07/opinion/google-sundar-
pichai-privacy.html

companies through its Real-Time Bidding ("RTB") system. RTB is the process by which the digital ads we see every day are placed. For each ad, an auction takes place milliseconds before it is shown in an app or browser. The hundreds of participants in these auctions receive sensitive information about the potential recipient of the ad—device identifiers and cookies, location data, IP addresses, and unique demographic and biometric information such as age and gender. Hundreds of potential bidders receive this information, even though only one—the auction winner—will use it to deliver an advertisement.

17.    "Bidstream Data" is the term Google uses to refer to the information it collects about auction participants.   Bidstream Data includes users' location, web browsing choices, and other data, which are then sold by data brokers to businesses, hedge funds, political campaigns, and even to the government without court orders.[2]

18.    The enormous data dossiers that Google has compiled on Americans are so enormous and extensive that that are reminiscent of what George Orwell warned about in "1984," except that Orwell only envisioned the government itself having enough power to engage in omnipresent surveillance of people's lives.

19.    In 2020, Google's parent Alphabet, Inc. reported $182.5 billion in revenues. Beginning in the fourth quarter of 2020, Alphabet began reporting its segment results as Google Services, Google Cloud, and Other Bets.  Advertising revenue is included in the Google Services segment.  In 2020, the vast majority of Alphabet's overall revenue -- $146.9 billion – was generated from Google advertising, with another $19.78 billion generated by YouTube ads, as reflected in the attached chart from Alphabet's 2020 Annual Report:

---

[2] Senator Ron Wyden (Oregon), et al. (July 31, 2020), Letter to Hon. Joseph J. Simmons, Chairman of the Federal Trade Commission (FTC) urging FTC investigation of RTB ("Wyden FTC Letter") available at https://www.wyden.senate.gov/imo/media/doc/073120%20Wyden%20Cassidy%20Led%20FTC%20Investigation%20letter.pdf

The following table presents our revenues by type (in millions).

| | Year Ended December 31, | |
|---|---|---|
| | 2019 | 2020 |
| Google Search & other | $ 98,115 | $104,062 |
| YouTube ads | 15,149 | 19,772 |
| Google Network Members' properties | 21,547 | 23,090 |
| Google advertising | 134,811 | 146,924 |
| Google other | 17,014 | 21,711 |
| Google Services total | 151,825 | 168,635 |
| Google Cloud | 8,918 | 13,059 |
| Other Bets | 659 | 657 |
| Hedging gains (losses) | 455 | 176 |
| Total revenues | $161,857 | $182,527 |
| *Google Services* | | |

20.     Google's ability to provide an extensive and personalized set of Bidstream Data for each Google Account Holder is the primary source of Google's massive advertising revenues.

21.     Google seeks to expand its huge advertising revenues by compiling extensive repositories of the most current information available about the people using its services so Google can sell such information to its advertising partners.  Google quietly collects and analyzes real-time information about everyone engaging on its platforms., Google does not disclose these practices to its account holders because transparency about those practices would lead to less user engagement on those platforms, which in turn would impede its ability to maximize targeted ad revenues.

22.     Instead, Google promises its account holders privacy and control. Any consumer can sign up for a Google Account by clicking a button assenting to the terms of service that Google has unilaterally drafted. In that contract, Google makes the following promises:

- "You get to decide how your information is used."[3]

- "We don't sell your personal information to anyone."[4]

---

[3] Pichai, Sundar (May 7, 2019), *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good,* The New York Times, available at https://www.nytimes.com/2019/05/07/opinion/google-sundar-pichai-privacy.html
[4] https://about.google/how-our-business-works/

- "Advertisers do not pay us for personal information."[5]
- "We don't share information that personally identifies you with advertisers."[6]
- "We also never use … sensitive information like race, religion, or sexual orientation, to personalize ads to you."[7]
- "We don't show you personalized ads based on sensitive categories, such as race, religion, sexual orientation, or health."[8]

23.     These representations are false. The Bidstream Data that Google sells and discloses to all Google RTB auction participants includes the Google Account Holder's unique device identifier; his/her IP address and Google ID; his/her "User-Agent" information; the content of the webpage the Google customer is viewing; the "Publisher ID of the website; and so-called "vertical" information about the Google Customer's interests that is associated with the bid that can include information relating to race, religion, health, and sexual orientation.   The vertical information is collected by Google over time and organized for each and every Google Customer by algorithm into thousands of consumer categories that identify the user's personal habits, interests and preferences.

24.     As a result, almost instantaneously, millions of times a day, Google provides each and every RTB auction participant with vast information about Google Account Holders, including the identity of the customer, their specific device, their specific location; the specific content of their communications; and highly sensitive information about race, religion, sexual orientation, and health. Google even provides RTB bidders with a service that helps them match up the Google Account Holders' current Bidstream Data with the library of information that the recipient has already collected regarding that Google Account Holder.

25.     The surreptitious data dossier that Google compiles about its users allows Google to charge premium prices from Google RTB auction bidders for placing targeted ads related to

---

[5] *Id.*
[6] Google Privacy Policy dated Feb. 42021 at 6.
[7] https://about.google/how-our-business-works/
[8] Google Privacy Policy dated Feb. 42021 at 6.

each Google Customer's activity on the Internet.

26.     All participants in Google RTB auctions including those who do not actually place bids, can save, store and use the Bidstream Data for each Google Customer. Once a Google Account Holders' Bidstream Data is published by Google, the data is not recoverable. It is permanently disclosed to RTB participants.

27.     Google does not disclose to its account holders its creation and use of massive data sets to profile them in these auctions, and it does not have account holders' consent for such activity. None of the categories of information in Bidstream Data are identified in any of the many policies and terms of service Google presents to account holders. The success of Google's RTB process largely relies on the fact that account holders are unaware that information drawn from their activities wholly unrelated to any bid are incorporated into what is presented to them in targeted ads. Had Google been transparent about its RTB practices, user engagement—a key metric for Google's sales—would have decreased

28.     The exchange of Bidstream Data for auction participation constitutes a "sale" of "personal information." Through its RTB auction, Google violates its express contractual promises to its account holders. It also violates laws prohibiting Google from selling account holders' personal and/or sensitive information, including when it sells and discloses such information for the purpose of targeting them.

29.     Many separate publishers participate in Google's ad systems. Each of those publishers is a potential recipient of Google RTB Bidstream Data, including the personal information Google tells account holders it will not share. Once a Google Account Holder's Bidstream Data is disseminated by Google, the data is not recoverable. The damage is irreparable.

30.     Since Google account holders are not informed about this dissemination of their personal information, they cannot exercise reasonable judgment to defend themselves against the ways Google has used and continues to use data Google has about them to make money for itself. Nor can account holders exercise reasonable judgment to defend themselves against RTB participants.

16.     Each day, nearly 20 million people check their Google privacy settings. People do this because they care about their privacy and believe that they can "control" what Google shares (because Google has told them so). The truth is that Google "controls" how it uses consumer data, and its representations about consumer control are meaningless.

17.     Plaintiff brings this class action on behalf of himself and all Google account holders in United States whose personal information was sold or shared by Google without their consent, and asserts claims for breach of contract, violations of statutory and common law, and equitable claims against Google for compensatory damages, unjust enrichment, punitive damages, injunctive relief, and all other remedies permitted by law.

## II.   JURISDICTION

23.     This Court has subject matter jurisdiction over the federal claims in this action. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a state other than the state in which Google maintains its headquarters (California).

24.     This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims arise out of the same case or controversy as those that give rise to the federal claims.

25.     This Court has personal jurisdiction over Defendant Google LLC ("Defendant" or "Google") because it is headquartered in this District. Google concedes to personal jurisdiction in its current and prior Google Terms of Service ("TOS").[9]

26.     This District is the correct venue because Google is headquartered in this District and because its TOS provides that Plaintiffs resolve disputes in this District.

27.     Assignment of this case to the San Jose Division is correct because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Santa Clara County, California.  *See* Civil Local Rule 3-2(c)(e)

---

[9] *See* Google Terms of Service dated Apr. 14, 2014, Oct. 25, 2017, and Mar. 31, 2020.

### III.   PARTIES

28.     Plaintiff Toronto is a citizen of New Jersey and is a Google Account Holder who uses the Internet, including websites from which Google sold and shared Google Account Holder information without authorization, as alleged herein. In order to become a Google Account Holder, Plaintiff was required to agree to Google's contractual terms and conditions. On information and belief, unbeknownst to Plaintiff at the time, Google sold and shared his personal information in Google RTB auctions on thousands of occasions over the years to thousands of unknown auction participants.

29.     Google is a limited liability company headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company headquartered in Mountain View, California. Alphabet trades on the Nasdaq under the symbol GOOG. Alphabet's revenues are primarily derived from Google's sale of targeted advertising that is driven by Google's RTB auction process. Google engages in, and its activities substantially affect, interstate trade and commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States.

### IV.   FACTS

#### A.     The Critical Importance of Advertising Revenue to Google

30.     In 2020, Google's parent Alphabet, Inc. reported $182.5 billion in revenues. Beginning in the fourth quarter of 2020, Alphabet began reporting its segment results as Google Services, Google Cloud, and Other Bets.  Advertising revenue is included in the Google Services segment.  In 2020, the vast majority of Alphabet's overall revenue -- $146.9 billion – was generated from Google advertising, with another $19.78 billion generated by YouTube ads, as reflected in the attached chart from Alphabet's 2020 Annual Report:

The following table presents our revenues by type (in millions).

|  | Year Ended December 31, | |
|---|---|---|
|  | 2019 | 2020 |
| Google Search & other | $ 98,115 | $104,062 |
| YouTube ads | 15,149 | 19,772 |
| Google Network Members' properties | 21,547 | 23,090 |
| Google advertising | 134,811 | 146,924 |

| | | |
|---|---|---|
| Google other | 17,014 | 21,711 |
| Google Services total | 151,825 | 168,635 |
| Google Cloud | 8,918 | 13,059 |
| Other Bets | 659 | 657 |
| Hedging gains (losses) | 455 | 176 |
| Total revenues | $161,857 | $182,527 |

***Google Services***

31.     As stated by Alphabet in its 2020 Annual Report, Google's advertising revenues consist primarily of the following:

- "Google Search & other" consists of revenues generated on Google search properties (including revenues from traffic generated by search distribution partners who use Google.com as their default search in browsers, toolbars, etc.) and other Google owned and operated properties like Gmail, Google Maps, and Google Play;

- YouTube ads consists of revenues generated on YouTube properties; and

- Google Network Members' properties consist of revenues generated on Google Network Members' properties participating in AdMob, AdSense, and Google Ad Manager.

32.     The revenues for Google's "Google Search & other" segment increased $5.947 billion from 2019 to 2020. Google stated that "The overall growth was primarily driven by interrelated factors including increases in search queries resulting from ongoing growth in user adoption and usage, primarily on mobile devices, growth in advertiser spending primarily in the second half of the year, and improvements we have made in ad formats and delivery. This increase was partially offset by a decline in advertiser spending primarily in the first half of the year driven by the impact of COVID-19."

33.     The revenues from YouTube ads increased $4.623 billion from 2019 to 2020. Google stated that "Growth was primarily driven by our direct response advertising products, which benefited from improvements to ad formats and delivery and increased advertiser spending. Brand advertising products also contributed to growth despite revenues being adversely impacted by a decline in advertiser spending primarily in the first half of the year driven by the impact of COVID-19."

34.    Google's ability to provide an extensive and personalized set of Bidstream Data for each Google Account Holder is the primary source of Google's massive advertising revenues.

**B.    A Sampling of Google's Past Violations of Privacy Laws**

35.    Google has run afoul of privacy laws numerous times.  On September 4, 2019 it was announced that Defendant Google LLC and its subsidiary YouTube, LLC would pay a record ***$170 million*** to settle allegations by the Federal Trade Commission and the New York Attorney General that the YouTube video sharing service ***illegally collected personal information from children without their parents' consent***.  A true and correct copy of such settlement agreement is attached hereto as __Exhibit 1__.

36.    The settlement required Google and YouTube to pay $136 million to the FTC and $34 million to New York for allegedly violating the Children's Online Privacy Protection Act (COPPA) Rule. The $136 million penalty was at the time by far the largest amount the FTC had ever obtained in a COPPA case since Congress enacted the law in 1998, and upon information and belief remains to this day the largest COPPA settlement.

37.    In their complaint filed against the companies, the FTC and New York Attorney General alleged that YouTube violated the COPPA Rule by collecting personal information—in the form of persistent identifiers that are used to track users across the Internet—from viewers of child-directed channels, without first notifying parents and getting their consent. YouTube earned millions of dollars by using the identifiers, commonly known as cookies, to deliver targeted ads to viewers of these channels, according to the complaint.

38.    The COPPA Rule requires that child-directed websites and online services provide notice of their information practices and obtain parental consent prior to collecting personal information from children under 13, including the use of persistent identifiers to track a user's Internet browsing habits for targeted advertising. In addition, third parties, such as advertising networks, are also subject to COPPA where they have actual knowledge they are collecting personal information directly from users of child-directed websites and online services.

39.     "YouTube touted its popularity with children to prospective corporate clients," said FTC Chairman Joe Simons at the time. "Yet when it came to complying with COPPA, the company refused to acknowledge that portions of its platform were clearly directed to kids. There's no excuse for YouTube's violations of the law."

40.     The YouTube platform allows Google account holders, including large commercial entities, to create "channels" to display their content. According to the complaint, eligible channel owners can choose to monetize their channel by allowing YouTube to serve behaviorally targeted advertisements, which generates revenue for both the channel owners and YouTube.

41.     YouTube is today's leader in reaching children age 6-11 against top TV channels. YouTube: The new "Saturday Morning Cartoons". 93% of tweens visit YouTube to watch videos. YouTube is unanimously voted as the favorite website of kids 2-12. In fact, it's the #1 website regularly visited by kids. Google and YouTube told Mattel, maker of Barbie and Monster High toys, that "YouTube is today's leader in reaching children age 6-11 against top TV channels" and told Hasbro, which makes My Little Pony and Play-Doh, that YouTube is the "#1 website regularly visited by kids."

42.     At all relevant times, Google has known that underage children extensively use YouTube and that the privacy and protection of minor children is extremely important to parents and society in general.  The following statements Google has made in the past about YouTube reflect Google's knowledge of the extent to which underage children use YouTube:



43.     Google's 2019 Settlement with the FTC and N.Y. (see **Ex. 1**) also prohibited Google and YouTube from violating the COPPA Rule, and required them to provide notice about their data collection practices and obtain verifiable parental consent before collecting personal information from children.

44.     While the 2019 settlement and judgment against Google represented the largest fine or penalty related to COPPA, it was by no means the only privacy judgment that has been entered against Google.  Other judgments related to privacy violations include, as reflected in the attached chart, a $57 million fine from French authorities, a $22.5 million fine imposed by the FTC in 2012, a $7 million fine imposed by states in 2013, and a $1.4 million fine by Italian authorities in 2014:



45.     With respect to the French judgment, On 21 January 2019, the French National Data Protection Commission (CNIL) imposed a €50m (£44m) fine against Google LLC, following complaints made by the privacy rights groups None Of Your Business and La Quadrature du Net three days after the enactment of the General Data Protection Regulation (GDPR).

46. The CNIL found that, despite seeking to implement corrective measures, Google had:

a.   breached its obligations to act transparently and provide information in a way that was easily accessible to its users. Relevant information about data collection and processing was only accessible after several (and up to 5 or 6) actions, and was neither clear nor comprehensive, and

b.   did not have any legal basis for processing its users' data in order to provide personalized advertisements. Users had given consent to Google for all the processing purposes carried out by Google (including ads personalization but also speech recognition and other purposes). Consent, under the GPDR, must be specific and given distinctly for each processing purpose.

47.   Google filed a frivolous appeal of the $57 million French fine.  The appeal was "slapped down" by a French court, as reported on June 19, 2020.  See Natasha Lomas, "French Court Slaps Down Google's Appeal Against $57M GDPR Fine," Tech Crunch, June 19, 2020.

48.   Since the 2019 settlement with the FTC, Google's violations of privacy laws have continued unabated.  Google has repeatedly represented to consumers that it values privacy and gives users control of their personal information. Just months before it was forced to pay the $170 million judgment to the FTC, Google's CEO Sundar Pichai stated that "Google will never sell any personal information to third parties" and "you get to decide how your information is used."[10] These promises were, and continue to be, false. Google monitors customers who have Google accounts ("Account Holders") on their Internet presence, then makes billions of dollars by selling consumers' sensitive personal information.

**C.   Google Falsely Promises to Protect Its Customers' Privacy**

49.   Google represents to users that: "When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information[.]"[11]

---

[10] Pichai, Sundar (May 7, 2019), *Google's Sundar Pi*chai: Privacy Should Not Be a Luxury Good, The New York Times, available at https://www.nytimes.com/2019/05/07/opinion/google-sundar-pichai-privacy.html
[11] *E.g.*, Google Privacy Policy dated May 25, 2018; Google Privacy Policy dated Dec. 19, 2019; Google Privacy Policy dated Feb. 4, 2021.

50.     Google's own research indicates consumers are more likely to trust a company when the consumers believe they have control over how the company uses their information.  In 2016, a Google researcher published a research paper titled "Sensitivity of personal data items in different online contexts,"[12] and other Google researchers have since explained the need for transparency regarding how user information is handled.[13] Google researchers have explained that when users are more likely to freely share their information when trust is established and they believe they are in control of whether and how their personal information is being used.[14]

51.     On June 6, 2016, a coalition of technology companies and privacy advocates united to oppose Congressional efforts to expand government surveillance of online by signing a joint letter with the ACLU, Amnesty International and other NGOs, taking the position that online surveillance without court oversight raises "civil liberties and human rights concerns" because it the information obtained "would paint an incredibly intimate picture of an individual's life" that would include "browsing history, email metadata, location information, and the exact date and time a person signs in or out of a particular online account" which would "reveal details about a person's political affiliation, medical conditions, religion, substance abuse history, sexual orientation" and even physical movements.[15]

52.     Beginning in August 2020, Google promised to restrict advertising with respect to "products or services that are marketed or targeted with the express purpose of tracking or monitoring another person or their activities without their authorization," because such

---

[12] Martin Ortlieb and Ryan Garner, *Sensitivity of personal data items in different online contexts*, De Gruyter Oldenbourg (June 3, 2016) available at https://www.degruyter.com/document/doi/10.1515/itit-2016-0016/html (Last Visited Apr. 26, 2021).

[13] Igor Bilogrevic and Martin Ortlieb, *"If You Put All The Pieces Together…" – Attitudes TowardsData Combination and Sharing Across Services and Companies*, CHI Conference on Human Factors in Computing Systems (May 2016), available at https://dl.acm.org/doi/pdf/10.1145/2858036.2858432 (Last Visited Apr. 26, 2021).

[14] Martin Ortlieb, et al., *Trust, Transparency & Control in Inferred User Interest Models*, CHI Extended Abstracts on Human Factors in Computing Systems (April 2014).

[15] June 6, 2016 Joint Letter. Available at http://www.ala.org/advocacy/sites/ala.org.advocacy/files/content/advleg/federallegislation/06-06-16%20Coalition%20Letter%20to%20Senators%20in%20Opposition%20to%20Expansion%20of%20NSL%20Statute%20on%20ECTRs.pdf

1    nonconsensual surveillance of "browsing history" is "dishonest behavior."[16]

2        53.    Google's recognition of the value of trust on the issue of Internet privacy

3    underscores its awareness of the materiality of its repeated statements designed to give Google

4    Account Holders a false impression of safety and control over their data.

5        54.    On December 11, 2018, Google CEO Sundar Pichai testified before Congress

6    and repeated Google's promise that "We do not and would never sell consumer data."[17]

7        55.    On May 7, 2019, Pichai published an opinion piece in the New York Times,

8    stating: "To make privacy real, we give you clear, meaningful choices around your data. All

9    while staying true to two unequivocal policies: that Google will never sell any personal

10   information to third parties; and that you get to decide how your information is used":[18]

11       56.    On October 28, 2020, during his testimony before the Senate Committee on

12   Commerce, Science and Transportation, Pichai stated: "Privacy is one of the most important

13   areas we invest in as a company. Have thousands of engineers working on it. We believe in

14   giving users control, choice, and transparency. And anytime we associate data with users, we

15   are transparent."

16       57.    Google makes these promises and public statements regarding the use of Google

17   Account Holders' personal information to create trust, increase user engagement and increase

18   revenue for Google. Higher user engagement means more revenue in that moment for Google

19   (and also more data about the users that can lead to more revenue). By promising more privacy,

20   and failing to deliver on those promises, Google misleadingly induces more data sharing.

21

22

23

24

---

[16] https://support.google.com/adspolicy/answer/9726908?hl=en&ref_topic=29265 (last visited Apr. 22, 2021)

[17] *See* Google CEO Sundar Pichai Testifies Before the House Judiciary Committee. December 11, 2018. Available at https://www.c-span.org/video/?455607-1/google-ceo-sundar-pichai-testifies- data-privacy-bias-concerns# (at 1:33:51).

[18] Pichai, Sundar (May 7, 2019), *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good,* The New York Times, available at https://www.nytimes.com/2019/05/07/opinion/google-sundar-pichai-privacy.html

**D.      Google Represents That It Will Not Sell Customers' Personal Information**

58.      Google adopts California law in its contract with Google Customers. The Bidstream Data provided by Google constitutes personal information under California law and the exchange of that data for participation in the auction constitutes a sale of that personal information.  Google's sale of its customers' personal information breaches Google's express promises and violates laws that prohibit the selling of users' personal and highly sensitive information.

59.      Google Account Holders are required to open a Google Account in order to access many of Google's products.[19] To open a Google Account, a consumer must indicate they agree to Google's Terms of Service ("TOS").[20] The TOS designates California law as the governing law, and thus Google is bound by California's definition of the term "personal information."

60.      Cal. Civ. Code § 1798.140(v)(1) defines "personal information" as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."

61.      Further, under California law, data or communications is considered property because it is an intangible thing a person has a right to possess, use or enjoy.

62.      As a result, Plaintiff and other Google Account Holders have a property interest in their own data and personal information.

63.      The California Consumer Privacy Act permits businesses to purchase consumer information from consumers themselves, *see* Cal. Civ. Code § 1798.125(b)(1), and permits businesses to assess and appraise—i.e., to place a monetary value on—consumer data. *See* Cal. Civ. Code §1798.125(a)(2)).

---

[19] Google Account Help, Create A Google Account, https://support.google.com/accounts/answer/27441?hl=en&ref topic=3382296. (last visited Apr. 21, 2021).

[20] Though the Terms of Service at issue are materially identical throughout the Class Period, the manner by which they were presented to persons creating a Google Account shifted slightly over the relevant time period. All versions of the Terms of Service contain the following assertions material to the claims asserted herein.

64.     Google has concealed its practices from consumers because disclosure of the truth would cause consumers to cancel their Google accounts and thus result in a significant decrease in advertising revenues for Google.

**1.   Google's Privacy Policy Promised to Protect Google Account Holders**

65.     Prior to approximately May 2018, Google Account Holders who created a Google Account were required to agree to both the TOS and the Google Privacy Policy (the "Privacy Policy"). The Privacy Policy made promises to Google Account Holders regarding the protection of their personal information.

66.     The Privacy Policy describes the information it associates with Google Accounts, i.e. "personal information," to include the following:

> The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity and the date, time, and referrer URL at your request.[21]

67.     The document at the "unique identifiers" hyperlink defines a unique identifier as "a string of characters that can be used to uniquely identify a browser, app, or device," which includes cookies, advertising ids and other unique device identifiers.[22]

68.     Google associates these unique identifiers—cookies, IP addresses, User-Agent information, advertising IDs, other unique device identifiers, and browsing history information—with individual accounts that include names, email addresses, geolocation, and all other information Google maintains on individual account holders.

69.     In addition, Google's Privacy Policy tracks the California Statutory definition of "personal information," defining it as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with Google

---

[21] *See, e.g., id.*
[22] *See, e.g., id.*

1   Account."[23]

2       70.     During the Class Period, Google assured Google Account Holders that personal

3   information would not be shared with third parties without Google Account Holders' consent.

4       71.     Google's Privacy Policy states that Google does not share information that

5   personally identifies a consumer with advertisers;[24] and that it does not share the Google

6   Account Holders' personal information with companies except with their consent.[25]  Google has

7   also promised that it does not show Google Account Holders personalized ads based on sensitive

8   categories, such as race, religion, sexual orientation, or health."[26]  And where the Privacy Policy

9   mentions sharing information with "partners," it emphasizes and promises that the information

10  shared is not personally identifiable.[27]

11      72.     The truth, however, is that Google's representations are untrue and misleading.

12  Google's disclosures describe "non-personally identifiable information" as "information that is

13  recorded about users so that it no longer reflects or references an individually-identifiable

14  user;"[28] a definition that conflicts with California law and with Google's own statement that the

15  data associated with individual Google Account Holders is "personal information," regardless of

16  whether it "no longer reflects or references an individual user."[29]

17      73.     Second, Google' privacy policy states that Google limits collection of

18  "information from your browser or device for advertising and measurement purposes" to

19  "specific partners" listed in a hyperlink and promises that such information is limited to "non-

20  personally identifiable information."[30] The hyperlink repeats the false promise that: "We don't

21

22  _____

    [23] *See* Google Privacy Policy dated Dec. 19, 2019.

23  [24] *E.g.*, Google Privacy Policy dated May 25, 2018 at 5; Google Privacy Policy dated Dec. 19,
    2019.

24  [25] *E.g.*, Google Privacy Policy dated June 28, 2016 at 6; Google Privacy Policy dated Dec. 19,
    2019.

25  [26] *E.g.*, Google Privacy Policy dated May 25, 2018 at 5; Google Privacy Policy dated Dec. 19,
    2019.

26  [27] *E.g.*, *Id.*

27  [28] *E.g.*, *Id.*

    [29] *E.g.*, *Id.*

28  [30] *Who are Google's Partners?,* Google, https://policies.google.com/privacy/google-partners
    (last visited Apr. 21, 2021).

_____

**CLASS ACTION COMPLAINT**                                              20

share information that personally identifies you with our advertising partners[.]"[31]

### 2. Google's Terms of Service Falsely States that Google Will Not Sell Personal Information

74.     From approximately May 2018 to the present, consumers who opened Google accounts were required to agree only to the TOS. While Google Account Holders were not required to agree to the Privacy Policy during this period, creating a Google Account included a link to the Privacy Policy to show how Google would "process your information."[32] The Privacy Policy during this time contained repeated promises regarding how Google would use Google Account Holders' information.

75.     From March 31, 2020 to the present, despite the fact that the TOS states that the Privacy Policy is "not part of these terms,"[33]  the TOS makes reference to the Privacy Policy. During this period, the TOS incorporated a hyperlink to the "How our business works" webpage.

76.     The reference to "the way Google's business works" and hyperlink takes a Google Account Holder to Google's "How our business works" webpage, thereby incorporating that linked document into the TOS. On the very first page of that linked document, Google declares in large type: "***We don't sell your personal information to anyone***." Google also states, ***"[W]e never sell your personal information to anyone***[.]"[34]

77.     The "How our business works" page also represents: "Advertisers do not pay us for personal information[.]"; "[W]e never share that information with advertisers, unless you ask us to."; "We also never use your emails, documents, photos, or sensitive information like race, religion, or sexual orientation, to personalize ads to you." "We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information." "At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies." [35]

---

[31] *Id.*
[32] *See, e.g., Tom Leeman, How to create a Google Account,* YouTube (Feb. 2, 2020) https://youtu.be/ArZpwBl_z10 (at 4:40-4:45).
[33] *See* Google Terms of Service dated Mar. 31, 2020.
[34] https://about.google/how-our-business-works/ (last visited Apr. 29, 2021)
[35] *Id.*

78.     In addition, since March 31, 2020 the TOS have stated, "You have no obligation to provide any content to our services and you're free to choose the content that you want to provide."[36]

79.     Moreover, above and beyond the promises made in contractual documents of Google's TOS and Privacy Policy, Google has made other similar misrepresentations on its website in the "Who are Google's Partners" webpage; the Google Personalized Advertising webpage, the "We do not Sell your personal information to anyone" webpage, and the "Your privacy is protected by responsible data practices" webpage. These representations all pertain to Google's repeated false promise that it doesn't share information that personally identifies the Google Account Holder with their advertising partners.

**E.     Google Account Holders Are Not Told About the Use of Their Personal Information in RTB Auctions**

80.     The Google Ad Exchange is a digital auction house that provides a platform for placing targeted ads on users' web browsers and devices. Through the Google's RTB auctions on its Ad Exchange, Google shares and sells Google Account Holders' personal information with Google RTB auction participants to solicit bids for the right to display a real-time. The Google RTB auction ad exchange is the largest in the world, estimated to be responsible to 53 percent of all RTB transactions globally.

81.     Google's RTB auction process is misleadingly disclosed and otherwise hidden to Google Account Holders. It is an automated system that is invisible to Google Account Holders, which repeated sells their personal information to hundreds of participants.

82.     In the Google RTB auction, Google solicits participants to bid on ad space (the "Bid Request") targeted to a specific consumer ("the Consumer").  Google provides highly specific information about the Consumer to auction participants, including data that identifies the individual person being targeted through unique identifiers, device identifiers and IP addresses, among other information.

---

[36] *See* Google Terms of Service dated Mar. 31, 2020.

1   83.   Google RTB participants receive the information and compete for ad space to

2   send a message to the at a specific price. The winning bidder pays Google for the ad

3   placement. The Google RTB process takes place in a matter of milliseconds.

4   84.   But all auction participants, even those who do not win and those who do not

5   submit a bid, are able to collect Bidstream Data on the Consumer. Such "non-winning" auction

6   participants include not just auction participants who engage in the RTB process with the intent

7   of competing to fill the ad space, but also participants that have no interest in filling the ad space.

8   These participants engage in Google's RTB for the sole purpose of gaining access to the

9   Customer's Bidstream Data. Even though they do not bid, the participants' presence drives

10  interest and encourages competitive bids, which increases the reach and profitability of

11  Google RTB.

12  85.   The information about Google Account Holders passes through a complex series

13  of layers of demand-side platform and supply-side platforms in what is referred to as an "Ad

14  Stack" as the data published by Google to numerous third parties. The Ad Stack proceeds as

15  follows. First, the publisher is the website that has ad space to sell. Second, the supply side

16  platform ("SSP") is a separate entity that collects the Google Account Holder information to sell

17  and the information about the ad space to be filled. Third, the ad exchange organizes the auctions

18  between buyer and seller. Fourth, the demand-side platform ("DSP") submits bids on behalf of

19  advertisers for the ad space. Finally, fifth the advertiser purchases ads targeted to specific Google

20  Account Holders.  Google controls the Ad Stack in Google RTB auctions because Google

21  controls significant players at the SSP, ad exchange, and DSP layers of the Ad Stack.

22  86.   If the SSP is AdMob (i.e., "Advertising on Mobile"), an entity which is owned by

23  Google, Google/AdMob matches the cookie to the Google Account Holder's personal

24  information stored by Google. Due to its immense storage of individual personal information,

25  Google/AdMob has a practically unlimited ability to connect cookies to personal information.

26  From its vast data set on each Google Account Holder, Google creates a Bid Request –

27  containing the Google Account Holder's personal information and the content of the specific

28  article that is the subject of the Google Account Holder's interest. This Bid Request is then sent

1  to DSP participants of the Google RTB auction (DSPs bid on behalf of advertisers). All Google

2  RTB auction participants can review, save and use the personal information in the Bid Request.

3  Bids are submitted and the highest bidder wins the bid and places its ad on Medical Website's

4  webpage containing the breast cancer article which the Google Account Holder is viewing. This

5  process will repeat every time the user clicks another hyperlink to continue her research on

6  breast cancer; resulting in ever more personal information exchanged on Google's RTB auction.

7

8       **1.  How Google Shares Its Customers' Personal Information on the RTB Auction**

9       87.  A Google Account Holder's personal information is the most sought-after and

10  critical information for sale based on the order form in which the re-directed data is provided

11  from Google to the bidders:[37]  Data is shared under the following categories in the RTB,

12  according to Google:

13  • "[I]nformation that we know about the user," which includes, among other things, IP

14      address, Google ID, and user verticals;

15  • "[I]nformation that we know about the webpage or mobile app," which includes, among

16      other things, publisher ID, detected verticals, vertical weight, and content labels;

17  • Auction information, including a unique ID for the overall query, and the type of auction

18      that will be run for this query;

19  • "Information about the device," which includes, among other things, the type (e.g.,

20      phone, desktop, tablet), platform (e.g., Android, iPhone), brand, model, and operating

21      system;

22  • "Information for ad queries coming from mobile devices," which includes, among other

23      things, whether the request is coming from a smartphone or tablet, and information about

24      the mobile app.

25       88.  "Vertical" information is also transmitted by Google to define that Google

26  Account Holder's advertising segment, including, but not limited to, sexuality, ethnicity,

27

28  [37] https://developers.google.com/authorized-buyers/rtb/downloads/realtime-bidding-proto (last visited Apr. 23, 2021).

religion, and health conditions. This "vertical" information, which is made up of the personal

information Google has persistently collected on each individual Google Account Holder,

constitutes personal information under both California law and Google's express policies.  The

information shared by Google through its RTB auction is personal information that is reasonably

capable of being associated, or that could reasonably be linked, directly or indirectly, with a

particular consumer or household. Cal. Civ. Code § 1798.140(o)(1).

89.     In fact, bidders routinely associate this personal information with the consumer it

describes so intimately.  Google's unlawful dissemination and sale of this highly personal

vertical information violates its privacy promises, and constitutes an invasion of Google Account

Holders' reasonable expectation of privacy and right to privacy.

### 2. Google Sells RTB Participants Personally Identifiable Information About Its Customers

90.     Contrary to Google's representations that information it collects about Google

Account Holders is "anonymized," in reality   Google provides unique identifiers to RTB auction

participants to complement other information already possessed by the RTB participants.  This

results in increasingly large dossiers on each individual Google Account Holder.  RTB

participants are also able to infer sensitive verticals about an individual based on their web

activity, where they are located and what they purchase, which is provided by Google.

91.     Google allows the disclosure of personally identifiable information to RTB

auction participants by providing publishers with personal information that they use to

specifically identify the Google Account Holder for the purpose of bidding on an ad in Google's

Ad Exchange.  This is to say, Google provides personal information to an advertiser who bid on

an ad in the ad exchange.

92.     Google also allows the disclosure of personally identifiable information to RTB

auction participants by allowing participants in the auction, whether or not they submit a winning

bid, to create or continuously update and augment their own existing user data troves.

### 3. Google's Cookie Matching Service Enables RTB Participants to Gain Account Holders' Personal Information

93.     Google also provides assistance to Google RTB auction participants, allowing

such participants to assimilate Google Account Holder personal information made available in a Bid Request to the information those participants already have about specific individuals through Google's "cookie matching service." "Cookie matching enables Google RTB participants to match their own cookie—for example, an ID for a user that browsed your website—with a corresponding bidder-specific Google User ID, and construct user lists that can help the bidder make more effective bidding choices.[38]

94.     As a result, contrary to Google's representations to Google Account Holders that their Google ID is anonymous, whenever a Google Account Holder also has an account I.D. with the auction participant, cookie matching enables that RTB participant to match the personal information from Google RTB together with data it already has to enhance its profile of the Google Account Holder.

95.     Google RTB auction participants also receive "user lists" from Google that enable them to identify specific Google Account Holders, even when the Google Account Holder has taken steps to avoid Google's tracking of their activity. Google "recommend[s] that bidders instead store and look up list ids using either google user id or hosted match data as keys."[39]

96.     Through the implementation and use of its cookie matching service which "allows one to populate user lists"[40]  and enables RTB bidders to match their cookies with Google's, Google facilitates the identification of individual Google Account Holders.  This technique allows RTB bidders to determine whether an impression sent in a bid request is associated with one of users being targeted."[41]

97.     RTB auction participants use this personally-identifiable information to build detailed individual user profiles regarding Google Account Holders based on their browsing history.

### 4.   Millions of Companies Buy Google Account Holders' Personal Information

---

[38] Cookie Matching, https://developers.google.com/authorized-buyers/rtb/cookie-guide. (last visited Apr. 21, 2021).
[39] Real-Time Bidding Protocol Buffer v.203,https://developers.google.com/authorized-buyers/rtb/downloads/realtime-bidding-proto (last visited Apr. 22, 2021).
[40] *Id.*
[41] *Id.*

98.     Google does not tell Google Account Holders which companies are bidding on, and therefore accessing, their personal information, and which companies are winning the RTB auctions.  The Ad Exchange is not evident to Google Account Holders.  It exists in a virtual space, and not in a physical auction room.

99.     Google is not required under U.S. law to publish such information to American consumers. This information was reportedly obtained by the creation and deployment of web-crawling scripts. However, other jurisdictions do require some transparency into who is buying Google Account Holders' personal information. Disclosures and reports from those other jurisdictions indicate that the current reports and allegations regarding Google in the U.S. may dramatically underestimate participation in the Google RTB and the number of entities to which Google sells Google Account Holders' personal information.

100.     The European Union, for example, has different laws and requires Google to identify all companies with which it shares personal data in the European Economic Area. The published list includes 833 companies, including well-known companies like Amazon, Facebook, Twitter, Microsoft (LinkedIn), Netflix, as well as hundreds of little-known companies.[42] Similarly, a study submitted to the Irish Data Protection Commission estimated that an estimated 13.5 million websites participated in the Google RTB and 2,182 companies directly received Google RTB data.[43]

101.     Complaints have been made to the EU Data Protection Commission. As stated in one complaint to the EU's Data Protection Commission, real-time bidding represents a "vast systematic data breach" that allows data brokers to "develop intimate profiles about us, our afflictions and interests" for sale.[44]

102.     On January 22, 2021, the United Kingdom's Information Commissioner's Office announced that it was resuming its investigation into RTB, stating: "The complex system of RTB

---

[42] https://support.google.com/admanager/answer/9012903?hl=en (last visited Apr. 22, 2021)
[43] Dr. Johnny Ryan, Submission to the Irish Data Protection Commission, Irish Council for Civil Liberties (Sept. 21, 2020)  https://www.iccl.ie/wp-content/uploads/2020/09/1.-Submission-to-Data-Protection-Commissioner.pdf at 16-17.
[44] See https://www.irishtimes.com/business/technology/data-privacy-advocate-submits-further-evidence-in-google-ads-inquiry-1.4359853 (last visited May 2, 2021).

1  can use people's sensitive personal data to serve adverts and requires people's explicit consent,

2  which is not happening right now. . . . Sharing people's data with potentially hundreds of

3  companies, without properly assessing and addressing the risk of these counterparties, also raises

4  questions around the security and retention of this data."[45]

5       103.   Complaints filed with the Irish Data Protection Commission detail the categories of

6  sensitive personal information published in Google's RTB process, including political information,

7  and health categories.[46].

8       **F.   Google's Conduct is Quantifiable for Purposes of Assessing Damages**

9       104.   Advertising auctions confirm that the personal information Google sells to RTB

10  participants has economic value. The value of Americans' personal information gathered and

11  used by Google has been reported to be valued at $21.5 billion in 2018.[47]

12       105.   Further, participants in the auction who do not place advertisements are

13  incentivized to participate in the RTB auction solely to data mine consumer information in order

14  to monetize that information.

15       106.   Google's monetizes the value of Internet users' personal information. This is

16  reflected by Google's advertisement revenue. Google reported $146.9 billion in advertising

17  revenue in 2020, $134.8 billion in 2019, $116.3 billion in 2018, $95.4 billion in 2017, and $79.4

18  billion in 2016.[48] This translates to 83% of Google's total revenues in 2019, 85% in 2018, 86%

19  in 2017 and 88% in 2016.[49] Some large portion of information collected and sold by Google is

20

21  [45] *See* ICO Statement, *Adtech investigation resumes*; available at: https://ico.org.uk/ about-the-ico

22  /news-and -events/news-and-blogs/2021/01/adtech-investigation-resumes/ (last visited 5.5.21)

23  [46] *See* TechCrunch, *Ireland's data watchdog slammed for letting adtech carry on 'biggest breach of all time'* available at: https://techcrunch.com/2020/09/21/irelands-data-watchdog-slammed-for-letting-adtech-carry-on-biggest-breach-of-all-time/ (last visited 5.5.21)

24  [47] Robert Shapiro and Siddhartha Aneja, *Who Owns Americans' Personal Information and What Is It Worth?*, Future Majority (April 2019), *available at* https://futuremajority.org/wp-

25  content/uploads/PersonalInfo.pdf. Shapiro is a Senior Policy Fellow at the Georgetown

26  University McDonough School of Business and, among other past positions, served as the U.S. Under-Secretary of Commerce for Economic Affairs under President Clinton.

27  [48] *2018 Annual Report*, Alphabet Inc. (Feb. 4, 2019), https://www.sec.gov/Archives/edgar/data/1652044/000165204419000004/goog10-kq42018.htm (hereinafter "2018 Annual Report").

28  [49] 2019 Annual Report, Alphabet Inc. (Feb. 3, 2020), https://www.sec.gov/Archives/edgar/data/1652044/000165204420000008/goog10-k2019.htm (hereinafter "2019 Annual

1   included in these revenue figures.

2   107.   Google's data mining of Google Account Holders' personal information has also

3   helped the revenues of Google's associates, which include ads placed through Google's

4   partnered ad exchanges. Google reported the following revenues from Google associate

5   properties: $21.5 billion in 2019, $20 billion in 2018, $17.6 billion in 2017, and $15.6 billion in

6   2016.[50] Google reports "strength in both AdMob and AdManager" primarily led to the $2.4

7   billion increase in Google associate properties revenues from 2017 to 2018.[51]

8   **V.   CLASS ACTION ALLEGATIONS**

9   108.   This is a class action pursuant to Rules 23(a), (b)(2), and (b)(3) (or, alternatively,

10   23(c)(4)) of the Federal Rules of Civil Procedure on behalf of:

11
12   > All persons residing in the United States with a Google Account
   > who have used the Internet on or after Google began using RTB in
   > a manner that disclosed the Google Account Holders' personal
13   > information.

14   109.   Excluded from the Class are the Court, Defendant and its officers, directors,

15   employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity

16   in which any of them have a controlling interest.

17   110.   The members of the Class are so numerous that joinder of all members is

18   impracticable.

19   111.   Common questions of law and fact exist as to all members of the Class and

20   predominate over any questions affecting solely individual members of the Class. The questions

21   of law and fact common to the Class include:

22   a.   Whether Plaintiff and the Class had Google accounts;

23   b.   Whether Google sold Google Account Holder personal information to

24   others;

25

26   _____

27   Report");2018 Annual Report.
[50] 2019 Annual Report; 2018 Annual Report.
28   [51] 2019 Annual Report.

c.      Whether Google promised not to share personal information with others;

d.      Whether Google promised not to sell personal information to others;

e.      Whether Google shared Google Account Holder personal information with others;

f.      Whether Google was authorized to disclose Google Account Holder personal information to others;

g.      Whether Google was authorized to sell Google Account Holder personal information to others;

h.      Whether Google violated the laws and duties, as alleged herein;

i.      Whether Google Account Holders' Personal Information was improperly sold by Google;

j.      Whether Google was unjustly enriched by the unauthorized sales of Google Account Holders' personal information;

k.      Whether Plaintiff and the Class are entitled to declaratory relief, injunctive relief and/or damages, and if so the appropriate measure of such relief.

112.    Plaintiff's claims are typical of the claims of other Class Members, as all members of the Class were similarly affected by Google's wrongful conduct in violation of federal and California law as complained of herein.

113.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class action litigation. Plaintiff has no interest that conflicts with or is otherwise antagonistic to the interests of the other Class Members.

114.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages individual Class members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

115.    There will be no difficulty in management of this action as a class action.

## VI.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### CALIFORNIA CONSTITUTIONAL INVASION OF PRIVACY

125.    Plaintiff hereby incorporates all preceding paragraphs as if fully alleged herein.

126.    The California Constitution (Article I, Section 1) states, "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

127.    The phrase "and privacy" was added by an initiative adopted by California voters on November 7, 1972 (the Privacy Initiative). The Privacy Initiative created a private right of action against nongovernmental entities for invasions of privacy.

128.    The California Supreme Court has explained that, one of the principal "mischiefs" to which the Privacy Initiative was directed was "the overbroad collection and retention of unnecessary personal information by government and business interests." *White v. Davis*, 13 Cal.3d 757, 775 (Cal. 1975).

129.    Google's conduct in selling and sharing Plaintiffs' and Class Members' personal information violates its promises to the contrary.

130.    Google creates detailed dossiers of the personal information of Plaintiffs and Class Members, and then sells and shares it with numerous companies to profit and assist those other companies in creating their own separate dossiers about Plaintiffs and Class Members, from which those companies will further profit.

131.    Plaintiffs and Class Members have the right to privacy in their web-browsing history; in how their personal information is going to be used; in the right to withhold and not disclose their personal information, and all statutory privacy rights codified under federal and California law.

132.    Google has intruded on these privacy interests.

133.    Through Google's contracts and other statement, Google has promised not to share or sell Plaintiffs' and Class Members' personal information without their agreement.

134.    Plaintiffs and Class Members had a reasonable expectation of privacy. Google affirmatively promised users it would not share or sell their personal information without authorization.

135.    Google's actions constituted a serious invasion of privacy in that it violates several federal criminal laws, including the Electronic Communications Privacy Act; violates state criminal laws; violates the right to privacy located in the First Amendment of the United States Constitution; invaded the privacy rights of hundreds of millions of Google Account Holders; disclosed sensitive personal information related to the verticals alleged above; facilitated the disclosure of Google Account Holders by third parties who did not have legal access to their personal information; and shared and sold personal information of hundreds of millions of Google Account Holders.

136.    Google lacked a legitimate business interest in sharing and selling Plaintiffs' and Class Members' personal information without their authorization.

137.    Google acted with oppression, fraud, or malice in invading Plaintiffs' and Class Members' privacy.

138.    Plaintiffs and Class Members have been damaged by Google's invasion of their privacy and are entitled to just compensation in the form of actual damages, general damages, unjust enrichment, nominal damages, and punitive damages.

## SECOND CLAIM FOR RELIEF

### INTRUSION UPON SECLUSION

125.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

126.    A claim for intrusion upon seclusion requires (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

127.    Google intentionally intruded upon the Plaintiffs' and Class Members' solitude or seclusion by (1) monetizing Plaintiffs' and Class Members' personal information without their consent, and (2) by mining and distributing data that they were not authorized to sell or share.

128.    Google intentionally intruded upon the Plaintiffs' and Class Members' solitude or seclusion by facilitating cookie-matching with hundreds of other companies, as alleged herein.

1    Cookie matching enabled companies with limited information about Plaintiffs and other Class

2    Members to accumulate substantially more information about each individual Plaintiff and Class

3    Member from Google.

4         129.    Google intentionally intruded upon the Plaintiffs' and Class Members' solitude or

5    seclusion by selling and sharing Plaintiffs' and Class Members' sensitive personal information

6    for purposes of targeted advertising and publicized sensitive information to hundreds of other

7    companies.

8         130.    None of Google's actions were authorized by the Plaintiffs and Class Members.

9         131.    Google violated federal and state criminal and civil laws designed to protect

10    individual privacy and against theft.

11         132.    It is highly offensive to a reasonable person that Google's collected information

12    on the Google Account Holder's web browsing in order to sell and share it with hundreds of

13    unknown companies without Google Account Holders' consent.  It is also highly offensive that

14    Google shared personal information from Google Account Holders regarding highly sensitive

15    information, such as an individual's race, ethnicity, religion, health, and financial status.

16         133.    It was highly offensive to a reasonable person for Google to intentionally intrude

17    into Plaintiffs' and Class Members personal information, Internet communications, and

18    computing devices.

19         134.    Google has acted with oppression, fraud, or malice.

20         135.    Plaintiffs and Class Members are entitled to just compensation in the form of

21    actual damages, general damages, unjust enrichment, nominal damages, and punitive damages

22    under this cause of action.

23                   **THIRD CLAIM FOR RELIEF**

24              **PUBLICATION OF PRIVATE INFORMATION**

25         125.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

26         126.    Plaintiffs' and Class Members' personal information, including their sensitive

27    data and Internet communications, are private facts that Google promised not to share or sell to

28    advertisers.

1   127.   Google publicized Plaintiffs' and Class Members' private facts and the content of

2   their Internet communications by sharing and selling them to hundreds of different companies.

3   128.   These companies profit from acquiring personal information and creating vast and

4   rich dossiers to both target advertising and to further sell the personal information to other third

5   parties.

6   129.   Plaintiffs and Class Members did not know that Google shared or sold their

7   personal information and did not consent to such publication.

8   130.   It is highly offensive to a reasonable person that Google's sold and shared

9   personal information to hundreds of different advertising companies.

10   131.   Google acted with oppression, fraud, or malice.

11   132.   Plaintiffs and Class Members have been damaged by the publication of their

12   private information and are entitled to just compensation in the form of actual damages, general

13   damages, unjust enrichment, nominal damages, and punitive damages.

14   **FOURTH CLAIM FOR RELIEF**

15   **STATUTORY CALIFORNIA INVASION OF PRIVACY ACT**

16   125.   Google, headquartered in California, is subject to the California Invasion of

17   Privacy Act ("CIPA"), Cal. Penal Code §§ 630-638.

18   126.   Google is a "person" within the meaning of § 631(a) of the Cal. Penal Code.

19   127.   Google aided, agreed with, and conspired with Google RTB participants to aid

20   them in reading, and/or or using the contents or meaning of the communications being

21   exchanged connected to the Plaintiffs' and Class Members' personal information by employing

22   the RTB auction to sell and share Google Account Holder information to hundreds of Google

23   RTB participants in real-time while communications between the Google Account Holders and

24   first-party websites were still in transit or being sent or received within California.

25   128.   Plaintiffs and Class Members did not consent to Google's actions with Google

26   RTB participants in reading and/ or using the contents or meaning of Plaintiffs' and Class

27   Members' communications with websites that Plaintiffs and Class Members were directly

28   interacting with.

1        129.    The cookies Google used; Plaintiffs' and Class Members' browsers; personal

2  computing devices; Google's web servers; the webservers of non-Google websites from which

3  Google tracked, intercepted, shared, and sold the Plaintiffs' and Class Members'

4  communications; and web servers of the Google RTB participants to which Google sold and

5  shared Plaintiffs' and Class Members' communications; and the computer code Google deployed

6  to effectuate its scheme, including but  not limited to Bid Requests for each Consumer Google

7  caused to be submitted to Google RTB participants all constitute "machine[s], instrument[s], or

8  contrivance[s]" under § 631(a).

9        130.    Even if the above-listed items do not constitute "machine[s], instrument[s], or

10  contrivance[s]," Google's deliberate and purposeful efforts to facilitate its conduct comprise "any

11  other manner."

12        131.    Google's aid to the Google RTB participants occurred   in "real time."

13        132.    Google's aid to Google RTB participants occurred while Plaintiffs' and Class

14  Members' communications with first-party websites were in transit or in the process of being

15  sent or received.

16        133.    Google's RTB documentation concedes that the information Google aided RTB

17  participants in reading included the "contents" and "meaning" of the Plaintiffs' and Class

18  Members' communications with first-party websites.

19        134.    Plaintiffs and Class Members have suffered loss by reason of these violations,

20  including, but not limited to, violation of their rights to privacy and loss of value in their personal

21  information.

22        135.    Plaintiffs and Class Members have a right to disgorgement and/or restitution

23  damages for the value of the stolen data because taking Plaintiffs' and Class Members' personal

24  information without authorization is larceny under California law

25        136.     Because Plaintiffs and Class Members have been injured by Google's violations

26  of Cal. Pen. Code § 631, each seeks damages of the greater of $5,000 or three times the amount

27  of actual damages, if any, sustained, as well as injunctive relief.

28

## FIFTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

125.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

126.    Google's relationship with its Google Account Holders is governed by the Google's TOS and Privacy Policy.

127.    Since March 31, 2020, the Google TOS incorporated by reference the document titled "How our business works."

128.    Through these documents, Google tells Google Account Holders, among other things, that "We don't sell your personal information to anyone."

129.    Since at least May 25, 2018, the Google Privacy Policy has also told Google Account Holders: "We don't share information that personally identifies you with advertisers[.]"

130.    Moreover, since at least March 1, 2012, the Privacy Policy has promised, "We do not share your personal information with companies, organizations, or individuals outside of Google[.]" Prior to May 2018, Google Account Holders who created a Google Account were required to agree to both the TOS and the Privacy Policy. From May 2018 to March 31, 2020, while Google Account Holders were required to agree to only the TOS, the Google Account creation process included a link to the Privacy Policy as a guide to how Google would "process your information."

131.    Google has breached and continues to breach its contractual promise to maintain the privacy of Google Account Holders' personal information by selling and sharing Plaintiffs' and Class Members' personal information through Google RTB.

132.    As a result of Google's breach of its contractual obligations, Google was able to obtain the personal property of Plaintiffs and Class Members and cause privacy injury and other consequential damages.

133.    Plaintiffs and Class Members did not receive the benefit of the bargain for which they contracted and for which they paid valuable consideration in the form of agreeing to share personal information. As alleged above, this personal information has ascertainable value to be proven at trial.

134.    As a result of Google's breach of its contractual promises, Plaintiffs and Class Members are entitled to recover benefit of the bargain damages, unjust enrichment, and nominal damages.

**SIXTH CLAIM FOR RELIEF**

**BREACH OF THE IMPLEIED COVENANT OF**

**GOOD FAITH AND FAIR DEALING**

135.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

136.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.

137.    The terms of Google's contract with Google Account Holders supposedly respect and protect Google Account Holders' privacy and promise not to sell or share their personal information. Google violated these contractual promises, and frustrated the purpose of those terms by selling and sharing Google Account Holders' personal information.

138.    As alleged in the Factual Section of this Complaint, Google made statements concerning the supposed privacy of Google Account Holder personal information outside of the contractual terms.  By violating these extra-contractual terms and thereby acting in bad faith, Google violated the implied covenant of good faith and fair dealing.

139.    Google's failure to disclose to Plaintiffs and Class Members that it was sharing and selling their personal information was unreasonable and evaded the spirit of the bargain made between Google, Plaintiffs and Class Members.

140.    Google's use of Plaintiffs' and Class Members' personal information to target them and enable other companies to add to their own user profiles was in bad faith, and promising Plaintiffs' and Class Members' personal information would not be disclosed induced them to trust Google and share their personal information with Google.

141.    As a result of Google's misconduct and breach of its duty of good faith and fair dealing, Google was able to obtain the valuable personal property of Plaintiffs and Class Members, earn unjust profits, and cause privacy injury and other consequential damages.

142.    As a result of Google's bad faith breach of its contractual and extra-contractual promises, Plaintiffs and Class Members are entitled to recover benefit of the bargain damages, unjust enrichment damages in the form of restitution measures by either unearned profits or a reasonable royalty value, and nominal damages.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**VIOLATION OF ECPA WIRETAP AND STORED COMMUNICATIONS ACT – UNAUTHORIZED DISCLOSURE OF ELECTRONIC COMMUNICATIONS**

143.    Plaintiffs incorporate all preceding paragraphs as though set forth herein.

144.    Plaintiffs are Google Account Holders who also use the Google Chrome web browser.

145.    The Google Chrome Browser is an ECS.

146.    The ECPA Wiretap provision of the statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

147.    The ECPA Stored Communication provision provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

148.    <u>Electronic Storage</u>: The ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

149.    Google stores Plaintiffs' and Class Members' personal information and the contents of their communications in the Chrome browser and files associated with it.

Specifically, Google stores the content of Plaintiffs' and Class Members' Internet communications within the Chrome browser in two ways:

    a.    For purposes of backup protection so that if the browser inadvertently shuts down, Plaintiffs' and Class Members' can be presented with the option to restore their previous communications; and

    b.    For a temporary and intermediate amount of time incidental to the electronic transmission thereof when it places the contents of user communications into the browser's web-browsing history, which is only kept on the browser for 90 days.

150.    When a Google Account Holder clicks a button or hits ENTER to exchange a communication with the website the Google Account Holder is interacting with while using the Chrome browser, the content of the communication is immediately placed into storage within the Chrome browser.

151.    Google knowingly divulges the contents of Plaintiffs' and Class Members' communications to hundreds of different companies through the Google RTB process while such communications are in electronic storage.

152.    <u>Electronic Communication Service</u>.   An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

153.    The Google Chrome web browser is an electronic communication service. It provides to users thereof the ability to send or receive electronic communications. In the absence of a web browser or some other such system, Internet users could not send or receive communications over the Internet.

154.    Intentional Divulgence. Google intentionally designed the Chrome web browser so that it would divulge the contents of Plaintiffs' and Class Members' communications with non-Google websites to hundreds of Google RTB participants.

155.    <u>While in Transmission</u>. Google Chrome's divulgence of the contents of Plaintiffs' and Class Members' communications was contemporaneous with their exchange with the websites to which they directed their communications. As described above, the Google RTB

1   process occurs in milliseconds while the communication is still being exchanged between

2   Plaintiffs and Class Members and the websites to which they directed their communications.

3   That is why Google itself refers to the process as "Real-Time Bidding." The signal sent out to

4   Google RTB is sent simultaneously with the signal sent to the websites to which Plaintiffs' and

5   Class Members' communications were directed.

6       156.    Google Chrome is not a party to Plaintiffs' and Class Members' electronic

7   communications exchanged with the non-Google websites to which Plaintiffs and Class

8   Members directed their communications.

9       157.    Google Chrome divulged the contents of Plaintiffs' and Class members'

10  electronic communications with the non-Google websites to which their communications were

11  directed through the surreptitious duplication, forwarding, and re-direction of those

12  communications to Google. The divulgence of the contents of Plaintiffs' and Class Members'

13  communications was without authorization. Google Chrome divulged the contents of Plaintiffs'

14  and Class Members' communications to hundreds of Google RTB participants, entities other

15  than the intended recipient of such communication, while Plaintiffs' and Class Members'

16  communications were being transmitted on Google Chrome.

17      158.    Exceptions to Wire Tap Do Not Apply. In addition to the exception for

18  communications directly to an ECS or an agent of an ECS, the Wiretap Act states that "[a]

19  person or entity providing electronic communication service to the public may divulge the

20  contents of any such communication":

21      a.      "as otherwise authorized in section 2511(2)(a) or 2517 of this title;"

22      b.      "with the lawful consent of the originator or any addressee or intended
23              recipient of such communication;"

24      c.      "to a person employed or authorized, or whose facilities are used, to
25              forward such communication to its destination;" or

26      d.      "which were inadvertently obtained by the service provider and which
                appear to pertain to the commission of a crime, if such divulgence is made to a
27              law enforcement agency."

28  18 U.S.C. § 2511(3)(b).

159.    <u>Exceptions to Storage Do Not Apply</u>. Section 2702(b) of the Stored Communications Act provides that an electronic communication service provider "may divulge the contents of a communication—"

a.      "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient;"

b.      "as otherwise authorized in section 2517, 2511(2)(a), or 2703 of this title;"

c.      "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;"

d.      "to a person employed or authorized or whose facilities are used to forward such communication to its destination;"

e.      "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service":

f.      "to the National Center for Missing and Exploited Children, in connection with a reported submitted thereto under section 2258A;"

g.      "to law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;"

h.      "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency;" or

i.      "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies section 2523."

160.    <u>Plaintiffs'</u> and Class Members' communications while stored in Chrome are not "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of the Plaintiffs' and Class Members' communications.

161.    Sections 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

162.    Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not
>
> utilize service observing or random monitoring except for mechanical or service quality control checks.

163. Google's divulgence of the contents of Plaintiffs' and Class Members' communications on the Chrome browser to hundreds of Google RTB participants was not authorized by 18 U.S.C. § 2511(2)(a) in that it was neither a necessary incident to the rendition of the Chrome service nor necessary to the protection of the rights or property of Google.

164. Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

165. Google's divulgences of the contents of Plaintiffs' and Class Members' communications on the Chrome browser to hundreds of Google RTB participants was not done "with the lawful consent of the originator or any addressee or intended recipient of such communication[s]." As alleged above, Plaintiffs and Class Members did not authorize Google to divulge the contents of their communications to hundreds of Google RTB participants. Nor, as alleged above, did Google procure the "lawful consent" of the websites to which Plaintiffs and Class Members directed and exchanged communications.

166. <u>Wiretap:</u> The other companies to which Google sold, shared, and divulged Plaintiffs' and Class Members' content of communications were not "person[s] employed or authorized, or whose facilities are used, to forward such communication[s] to [their] destination."

167. <u>Storage:</u> The hundreds of other companies to which Google divulges the content of Plaintiffs' and Class Members' communications while in Chrome storage through the RTB process are not "person[s] employed or whose facilities are used to forward such communication

---

**CLASS ACTION COMPLAINT**      42

to its destination."

168.    The contents of Plaintiffs' and the Class Members' communications did not appear to pertain to the commission of a crime, and Google Chrome did not divulge the contents of their communications to a law enforcement agency.

169.    Plaintiffs and the Class Members seek appropriate preliminary and other equitable or declaratory relief; the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred. 18 U.S.C. § 2520.

## EIGHTH CLAIM FOR RELIEF

## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT – UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE

170.    Plaintiffs incorporate all preceding paragraphs as though set forth herein.

171.    The Electronic Communications Privacy Act ("ECPA") prohibits the unauthorized interception of the content of any communication through the use of any device, and any subsequent disclosure or use of the intercepted contents of any electronic communication. 18 U.S.C. §2511.

172.    ECPA protects both the sending and receipt of communications.

173.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

174.    Google violated the interception provisions of the Electronic Communications Privacy Act ("ECPA"), by either "intentionally disclosing, or endeavoring to disclose, to other companies the contents of Plaintiffs' and Class Members' electronic communications," 18 U.S.C. § 2511(1)(c); and/or by "intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications" and/or U.S.C. § 2511(1)(c).

175.    ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

176.   Google intercepted Plaintiffs' and Class Members' electronic communications, including:

    a.   The precise text of GET and POST requests that Plaintiffs and Class Members exchanged with non-Google websites to which they navigated;

    b.   The precise text of Plaintiffs' and Class Members' search queries at non-Google websites to which they navigated and on which they entered such queries; and

    c.   Information that is a general summary or informs Google (and the Google RTB participant) of the subject of communications between Plaintiffs and Class members and the first-party websites.

177.   The transmission of data between Plaintiffs and Class Members and the non-Google websites with which they chose to exchange communications are "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

178.   The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

179.   Google's developer documentation details the following content of electronic communications that it redirects to other companies in the Google RTB process:

180.   The ECPA defines "electronic, mechanical, or other device" as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

181.   The following constitute devices within the meaning of 18 U.S.C. § 2510(5):

    a.   The cookies Google used to acquire Plaintiffs' and Class Members' communications, including cookies Google sets, acquires, and discloses or sells to other companies through cookie-sharing;

    b.   The Plaintiffs' and Class Members' browsers;

    c.   The Plaintiffs' and Class Members' computing devices;

    d.   Google's web servers;

    e.   The web servers of the first-party non-Google websites from which Google tracked and intercepted the Plaintiffs' and Class Members' communications; and

f.  The computer code deployed by Google to effectuate its tracking and interception of Plaintiffs' and Class Members' communications for purposes of forwarding them to hundreds of Google RTB participants, without authorization, including but not limited to data contained in Bid Requests.

182.   Google intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the unauthorized purpose of selling and sharing those contents to Google's RTB participants.

183.   Plaintiffs and Class members did not authorize Google to acquire the content of their communications for purposes of sharing and selling the personal information contained therein. Indeed, Google promised that it would not share or sell user personal information, including browsing history.

184.   Google's interception of the contents of Plaintiffs' and Class  Members' communications was contemporaneous with their exchange with the websites to which they directed their communications. As described above, the Google RTB process occurs in milliseconds while the communication is still being exchanged between Plaintiffs and Class Members and the website to which they directed their communications. The signal sent out to Google RTB is sent simultaneously with the signal sent to the websites to which Plaintiffs' and Class Members' communications were directed.

185.   Google is not a party to Plaintiffs' and Class Members' electronic communications exchanged with the non-Google websites to which Plaintiffs and Class Members directed their communications.

186.   Google acquired the content of Plaintiffs' and Class members' electronic communications with the non-Google websites to which their communications were directed through the surreptitious duplication, forwarding, and re-direction of those communications to Google. After intercepting the communications without authorization, Google then sold and shared the contents of the intercepted communications to hundreds of Google RTB participants and used the contents of the intercepted communications in furtherance of the Google RTB auction.

187.   Google's interceptions do not qualify for any exceptions under the ECPA.

188.   As alleged throughout, Google's redirection, sale, and sharing of Plaintiffs' and Class Members' personal information and the contents of their Internet communications had the requisite criminal or tortious purpose for Plaintiffs' and Class Members' claims for intrusion upon seclusion; publication of private facts; tortious violation of Art. I, sec. 1 of the California Constitution; breach of confidence; violation of the California UCL, Cal. Bus. & Prof. Code § 17200; the California Invasion of Privacy Act, Cal. Penal Code § 630; the California Computer Data Access and Fraud Act, Cal. Penal Code § 502; California Statutory Larceny, Cal. Penal Code §§ 484 and 496; the Electronic Communications Privacy Act, 18 U.S.C. §2511; and the Video Privacy Protection Act, 18 U.S.C. § 2710.

189.   For the violations set forth above, Plaintiffs and Class Members seek equitable or declaratory relief; statutory damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred. 18 U.S.C § 2520.

## NINTH CLAIM FOR RELIEF

### VIOLATIONS OF THE CALIFORNIA UNFAIR

### COMPETITION LAW ("UCL")

### Cal. Bus. & Prof. Code § 17200, *et seq.*

190.   Plaintiffs incorporate all preceding paragraphs as though set forth herein.

191.   Google is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

192.   Google violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices in violation of Cal. Bus. & Prof. Code § 17200.

193.   Google violated the UCL by violating statutory laws as alleged in this Complaint. This includes, but not limited to, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 and 2701, et seq; the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq.; the California Computer Data Access and Fraud Act, and the Cal. Penal Code § 502.

194.   Google violated the UCL by violating constitutional and common laws as alleged in this Complaint.  This includes, but not limited to the common law right of privacy via intrusion upon seclusion and publication of private facts; the Art. 1, § 1 of the California

Constitution Right to Privacy; express contract promises to consumers; the duty of good faith and fair dealing; unjust enrichment; implied contract; and the duty to hold Google Account Holders' personal information in confidence, and violating its TOS, knowingly and willfully or negligently and materially, in violation of Cal. Bus. & Prof. Code § 22576

195.    Google violated the UCL by violating the unfair prong, as alleged in this Complaint.  This includes, but not limited to violating the spirit and letter of these laws, which protect property, economic and privacy interests, and prohibit unauthorized disclosure and collection of private communications and personal information; and stating it would not sell or disseminate Plaintiffs' and Class Members' personal information without their consent to other companies.

196.    Plaintiffs' and Class Members' loss of their personal information constitutes an economic injury.

197.    Plaintiffs and Class Members have suffered harm in the form of lost property value, specifically the diminution of the value of their private and personally identifiable data and content.

198.    Google's actions caused damage to and loss of Plaintiffs' and Class Members' property right to control the use of their personal information and communications.

199.    Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution, declaratory relief, reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5, injunctive relief, and all other equitable relief the Court determines is warranted.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Award compensatory damages to Plaintiffs and the Class against Defendants for all the damages resulting from Defendant's violations, in an amount to be proven at trial, including interest thereon;

B.    Award statutory damages in the amount to be proven at trial

C.      Award Plaintiffs and the Class damages due to unjust enrichment resulting from its violations identified herein, in an amount to be proven at trial, including interest thereon;

D.      Injunctive relief against Google, its officers, agents, servants, employees, and attorneys, from sharing or selling any existing account holder's personal information without express authorization for the sale of such information;

E.      Award Plaintiffs and the Class their reasonable fees, costs and expenses incurred in this action;

F.      Award Plaintiffs and the Class punitive damages pursuant to Cal. Civ. Code § 3294(a), as Google acted with oppression, fraud, or malic and;

G.      Grant Plaintiffs such further relief as the Court deems appropriate.

## VIII.   JURY TRIAL DEMAND

The Plaintiffs demand a jury trial.

Dated:  May 18, 2021

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Anne B. Beste
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov

s/ Francis A. Bottini, Jr.

Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002
abeste@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff and the Class*